DECISION
ON OBJECTIONS TO THE MAGISTRATE'S DECISION
{¶ 1} Relator, Linda G. Naylor, commenced this original action in mandamus seeking an order compelling respondent Industrial Commission of Ohio ("commission") to vacate its order denying her temporary total disability ("TTD") compensation and to enter an order awarding TTD compensation. In essence, relator disputes the commission's determination that she voluntarily abandoned her employment with respondent Tomasco Mulciber, Inc. ("Tomasco").
 {¶ 2} Pursuant to Civ.R. 53(C) and Loc.R. 12(M) of the Tenth District Court of Appeals, this case was referred to a magistrate of this court to conduct appropriate proceedings. The magistrate has rendered a decision, including findings of fact and conclusions of law, and has recommended that this court grant relator's request for a writ of mandamus ordering the commission to vacate the May 13, 2004 order of its staff hearing officer ("SHO") and to enter a new order that denies Tomasco's claim of a voluntary abandonment, and adjudicates relator's request for TTD compensation based upon the merits of the request.
 {¶ 3} Tomasco has filed objections to the magistrate's decision asserting two arguments. First, Tomasco argues that the magistrate erred in finding that relator did not voluntarily abandon her employment as contemplated by State ex rel.Louisiana-Pacific Corp. v. Indus Comm. (1995),72 Ohio St.3d 401. Second, Tomasco argues that the magistrate erred in finding that Tomasco's attendance policy did not clearly define the prohibited conduct because relator never asserted this argument. We find neither argument persuasive.
 {¶ 4} Because Tomasco's arguments are interrelated, we will address them together. Tomasco points to several provisions in its "Associate Handbook" as evidence of its attendance policy. First, Tomasco highlights a provision that addresses the situation where an employee has been absent from work for three days or more and then returns to work. The provision requires the employee to present a physician's statement (presumably justifying the absence) before the employee will be permitted to return to work. The provision goes on to describe the consequences if the employee fails to provide the required documentation (i.e., unexcused absences and the accumulation of attendance points). Second, Tomasco points to a provision that addresses attendance points for unannounced absences. Neither of these provisions, however, address the factual circumstance at issue here.
 {¶ 5} In the case at bar, relator did not return to work. Rather, Tomasco called relator in to discuss the status of her absence from work after Tomasco discovered that her scheduled surgery was cancelled. Because relator never returned to work, the first provision relied upon by Tomasco does not apply. Nor was relator's absence from work unannounced. Rather, relator was scheduled to be absent from work from January 7, 2004 through January 26, 2004 because of the anticipated surgery. Therefore, her absence during this timeframe was not unannounced even though the reason for her absence changed. Therefore, the second provision cited by Tomasco also does not apply to these facts.
 {¶ 6} Tomasco's handbook simply fails to address what obligation an employee has during an approved leave of absence when the circumstances that gave rise to the approved leave unexpectedly change — particularly, when the employee has not yet returned to work. Because Tomasco has failed to identify a written policy that clearly defines the prohibited conduct, we see no error in the magistrate's determination that relator did not voluntarily abandoned her employment as contemplated byState ex rel. Louisiana-Pacific, supra.
 {¶ 7} We also find Tomasco's wavier argument unpersuasive. Tomasco contends relator never argued in the administrative process or in her briefs to this court that the language in the Associate Handbook was unclear. Therefore, Tomasco asserts that it was improper for the magistrate to consider this argument. We disagree.
 {¶ 8} Relator clearly contested before the commission Tomasco's assertion that she voluntarily abandoned her employment. The provisions in the associate handbook relied upon by Tomasco for the termination were before the commission and are the foundation for Tomasco's argument. We see no reason why it was improper for the magistrate to consider the language in these provisions in assessing whether relator voluntarily abandoned her employment as contemplated by State ex rel. Louisiana-Pacific,
supra.
 {¶ 9} Following an independent review of this matter, we find that the magistrate has properly determined the pertinent facts and applied the appropriate law. Therefore, we adopt the magistrate's decision as our own including the findings of fact and conclusions of law contained therein. In accordance with the magistrate's decision, we issue a writ of mandamus ordering respondent-commission to vacate the May 13, 2004 order of its SHO, and to enter a new order that denies Tomasco's claim of a voluntary abandonment and adjudicates relator's request for TTD compensation on its merits.
Objections overruled; writ of mandamus granted.
Brown, P.J., and French, J., concur.
 APPENDIX A IN THE COURT OF APPEALS OF OHIO TENTH APPELLATE DISTRICT
State of Ohio ex rel. Linda G. Naylor, :
 Relator, :
v. : No. 04AP-715
Industrial Commission of Ohio and : (REGULAR CALENDAR)
Tomasco Mulciber, Incorporated, :
 Respondents. :
 MAGISTRATE'S DECISION Rendered on Heinzerling Goodman, LLC, and Jonathan H. Goodman, for relator.
Jim Petro, Attorney General, and Dennis L. Hufstader, for respondent Industrial Commission of Ohio.
Schottenstein, Zox Dunn Co., L.P.A., and Michael T.Short, for respondent Tomasco Mulciber, Incorporated.
 IN MANDAMUS {¶ 10} In this original action, relator, Linda G. Naylor, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order denying her temporary total disability ("TTD") compensation on grounds that she voluntarily abandoned her employment with respondent Tomasco Mulciber, Incorporated ("Tomasco"), and to enter an order awarding TTD compensation.
Findings of Fact:
 {¶ 11} 1. On September 7, 2001, relator sustained an industrial injury while employed as a "spot welder" for Tomasco, a state-fund employer. The industrial claim is allowed for "sprain of right wrist; sprain right thumb; trigger finger right thumb; left trigger thumb; bilateral carpal tunnel syndrome," and is assigned claim number 01-442425.
 {¶ 12} 2. During a December 4, 2003 office visit with orthopedic specialist J. Mark Hatheway, M.D., relator agreed to proceed with a left carpal tunnel release scheduled for January 7, 2004.
 {¶ 13} 3. On December 8, 2003, on form C-84, Dr. Hatheway certified a period of TTD from January 7, 2004 to an estimated return-to-work date of January 26, 2004.
 {¶ 14} 4. On December 11, 2003, Tomasco's managed care organization ("MCO") approved the request for authorization of a left carpal tunnel release.
 {¶ 15} 5. Relator worked at her spot welder job at Tomasco until January 6, 2004, the day prior to her scheduled surgery.
 {¶ 16} 6. On January 7, 2004, instead of undergoing surgery, relator was hospitalized at The Ohio State University Medical Center for psychiatric care. She was discharged from the hospital on Friday, January 9, 2004. The hospital discharge instructions state:
* * * [H]ospital course-[patient] was started on anti-psychotic and mood stabilizer medications, tolerated and responded well. [R]ecommendation-take medications as prescribed. Get a vpa level on 1/13/04 before morning dose of depakote (prescription given). [F]ollow up with out patient psychiatrist as scheduled. If you need refills on any medication, please follow up with primary care physician.
The hospital discharge instructions further state:
Appointment
New Horizons-Lancaster * * *. Intake appointment on Jan 16 at 10:00 am. Get there early to fill out paper work. They will work with you on days/times that will work for ongoing sessions.
 {¶ 17} 7. On January 15, 2004, relator saw Dr. Hatheway at his office. Dr. Hatheway wrote:
* * * She was scheduled for carpal tunnel release last week, but was severely agitated and actually was going through a psychotic break. She was hospitalized at OSU and in the psychiatric service there. She has been started on Depakote and Resperidol. She's feeling a bit better today and certainly less agitated, but still appears somewhat depressed. She's scheduled to see her psychiatrist tomorrow. At any rate, we cancelled her surgery last week and we will reschedule if we get clearance from the psychiatrist to do so.
PLAN: I'll see her back in one week for a recheck and if the psychiatrist states that it's okay to proceed, we will proceed with carpal tunnel release at that time.
 {¶ 18} 8. On January 22, 2004, Dr. Hatheway completed two additional forms based upon his January 15, 2004 examination of relator. On a MEDCO-14 and a C-84, Dr. Hatheway certified a period of TTD from January 7, 2004 to an estimated return-to-work date of March 1, 2004. On both forms, Dr. Hatheway indicated that the surgery would be performed on February 4, 2004.
 {¶ 19} 9. Apparently, on January 22, 2004, the Ohio Bureau of Workers' Compensation ("bureau") informed Tomasco that the surgery scheduled for January 7, 2004, had not taken place. This prompted Tomasco to call relator into work on January 22, 2004, to discuss the status of her absence from work. Unfortunately, the record contains no written record of the employer's conference with relator.
 {¶ 20} 10. By letter dated January 27, 2004, from Tomasco's Human Resource Mananager, Randall J. Miller, relator was informed:
In accordance to the TOMASCO Attendance Policy, your employment has been terminated effective January 27, 2004. Your failure to call off each and every day from 1/12/04 to 1/21/04 (8 work days) which is four (4) points per occurrence took you over the six (6) points required to separate from employment. * * *
 {¶ 21} 11. On February 3, 2004, Dr. Hatheway wrote:
Ms. Linda G. Naylor has been under my care for problems with both hands under the above-captioned claim. I had scheduled Linda G. Naylor for left carpal tunnel release on January 7, 2004. However, at that time, Ms. Naylor exhibited significant psychiatric problems and she was admitted to Ohio State University Hospital for treatment of that condition. She was hospitalized for a couple of days. She has remained under the care of a psychiatrist following it. I saw Linda Naylor on January 15, 2004. At that time, she seemed to have improved significantly from her psychiatric condition although she still seemed to be somewhat depressed. At that time, I recommended that we could proceed with carpal tunnel release if and when we obtain approval from her family physician who was controlling her medications for that condition.
I saw Linda Naylor back in my office today, February 3, 2004. I have received a letter from Dr. Sarah Alley, Ms. Naylor's primary care physician. At this time, Dr. Alley indicates that we may proceed with her carpal tunnel release surgery under local anesthesia.
When I scheduled her surgery, I did file a C-84 with the Bureau of Workers['] Compensation indicating that she would need to be off work from January 7, 2004 through March 1, 2004, to allow recovery from her surgery. We had to cancel the surgery on January 7th because of the psychiatric problems. The ongoing hand problems and the impending surgery certainly contributed to her psychiatric problems that came to full evidence on January 7th. In my opinion, the time off work from January 7, 2004 up until the present time is certainly justified. At this time, we have rescheduled her carpal tunnel release surgery for tomorrow, February 4, 2004. I will see her again in about two weeks after her surgery. She may need a new C-84 to extend her time off work beyond March 1, 2004, since there was a delay in performing her surgery due to legitimate medical considerations.
 {¶ 22} 12. On February 4, 2004, relator underwent a left carpal tunnel release performed by Dr. Hatheway.
 {¶ 23} 13. Following a March 9, 2004 hearing, a district hearing officer ("DHO") issued an order stating:
It is the order of the District Hearing Officer that the C-84 Request for Temporary Total Compensation filed by Injured Worker on 01/22/2004 is denied.
Temporary total disability compensation is denied from 01/07/2004 to 03/01/2004. The District Hearing Officer finds that Ms. Naylor's disability from 01/07/2004 to 01/27/2004 was not related to the allowed conditions. The District Hearing Officer further finds that Ms. Naylor voluntarily abandoned her employment as of 01/27/2004. Lacking any evidence of a subsequent return to the labor force, further temporary total disability compensation is denied.
Ms. Naylor was scheduled to undergo approved surgery through this claim on 01/07/2004. Despite difficulties, she continued to work. On the day of surgery, the procedure was postponed due to the development of intervening bipolar disorder, which necessitated hospitalization from 01/07/2004 to 01/09/2004. While Dr. Hatheway opines that the bipolar disorder was due to the symptoms attributable to this claim, a psychological condition is not allowed at this time.
Mr. Goodman argued that the conditions that necessitated the scheduled surgery also independently disabled Ms. Naylor. Yet there is no evidence of treatment between 01/07/2004 and 01/27/2004, except that for the psychological condition. Given the severity of the psychological condition, the postponement of surgery, and Ms. Naylor's ability to work until 01/06/2004, Mr. Goodman's argument is not supported.
Ms. Naylor was terminated on 01/27/2004. She failed to report her absence from work from 01/12/2004 to 01/21/2004. This resulted in progressive discipline consistent with the employer's written handbook rules. Ms. Naylor was aware of these rules. She gave no explanation for her failure to communicate her work absences. Instead, Mr. Goodman argued that the employer was aware that Ms. Naylor was disabled for this period. Since the District Hearing Officer found (above) that the allowed conditions were not the basis for temporary total disability compensation from 01/07/2004, there is no support for this argument. By 01/09/2004, Ms. Naylor was released from the hospital. There is no indication whether her medical status was communicated to the employer and as stated she did not report her absences from work.
Accordingly, her termination meets the requirements of a voluntary abandonment, which precludes temporary total disability compensation.
 {¶ 24} 14. Relator administratively appealed the DHO's order of March 9, 2004.
 {¶ 25} 15. Following a May 3, 2004 hearing, a staff hearing officer ("SHO") issued an order stating:
The order of the District Hearing Officer, from the hearing dated 03/09/2004, is affirmed. Therefore, the C-84 filed 01/22/2004 is denied.
The employer rejects the request for a new period of temporary total compensation from 01/07/2004 — 03/09/2004 and to continue as the claimant did not undergo the scheduled carpal tunnel release on 01/07/2004 and did not call off work from 01/12/2004 — 01/21/2004. The claimant's failure to call off work from 01/12/2004 — 01/21/2004 resulted in 8 points exceeding the requisite points for a discharge per the employer's written handbook. The Staff Hearing Officer finds the claimant's discharge on 01/27/2004 is found to be a voluntary abandonment as the claimant failed to call off from work 01/12/2004 — 01/21/2004. The claimant violated the written handbook policy which was received by the claimant per a signed acknowledgement form.
The Staff Hearing Officer does not find the Coolige Case
applicable in this case as the claimant was working up through 01/06/2004. On 01/07/2004, a carpal tunnel release was scheduled but was postponed due to a psychiatric hospitalization 01/07/2004 — 01/09/2004. The employee had worked up until 01/07/2004, the surgery for the allowed condition was the basis for the new period of temporary total compensation, however, the surgery did not take place until 02/04/2004 due to the psychiatric hospitalization. Despite the C-84 dated 12/08/2004 of Dr. Hatheway, the temporary total requested on 01/07/2004 was premised on the anticipated surgery of 01/07/2004 for the allowed carpal tunnel syndrome. Since the claimant did not undergo the surgery for the allowance, the employee's disability was not related to the allowance on 01/07/2004 but rather due to the non-allowed psychiatric conditions. The Bureau of Workers' Compensation informed the employer on 01/22/2004 that claimant did not, in fact, have the carpal tunnel release on 01/07/2004.
The employer called the claimant into work on 01/22/2004 to discuss the status of her absences from 01/07/2004 — 01/22/2004. The employer discharged the claimant on 01/27/2004 due to violation of written employee policies for failure to call off work. In the Coolige Case, the claimant was in fact off work due to allowances of the claim. In the present case, the claimant was not disabled due to the allowances from 01/07/2004 — 01/26/2004 (day before discharge) as the claimant did not undergo the 01/07/2004 surgery for the allowed conditions. For these reasons, a voluntary abandonment of employment is found.
Therefore, temporary total compensation is denied from 01/07/2004 — 03/01/2004.
The Staff Hearing Officer relies on Dr. Miller's testimony, the 01/07/2004 hospital records, and the C-84 dated 12/08/2004 of Dr. Hatheway.
 {¶ 26} 16. On May 28, 2004, another SHO mailed an order refusing relator's administrative appeal from the SHO's order of May 3, 2004.
 {¶ 27} 17. On July 16, 2004, relator, Linda G. Naylor, filed this mandamus action.
Conclusions of Law:
 {¶ 28} It is the magistrate's decision that this court issue a writ of mandamus, as more fully explained below.
 {¶ 29} In State ex rel. Louisiana-Pacific Corp. v. Indus.Comm. (1995), 72 Ohio St.3d 401, 403, the claimant was fired for violating the employer's policy prohibiting three consecutive unexcused absences. The court held that the claimant's discharge was voluntary, stating:
* * * [W]e find it difficult to characterize as "involuntary" a termination generated by the claimant's violation of a written work rule or policy that (1) clearly defined the prohibited conduct, (2) had been previously identified by the employer as a dischargeable offense, and (3) was known or should have been known to the employee. Defining such an employment separation as voluntary comports with Ashcraft [State ex rel. Ashcraft v.Indus. Comm. (1987), 34 Ohio St.3d 42] and Watts [State exrel. Watts v. Schottenstein Stores Corp. (1993),68 Ohio St.3d 118] — i.e., that an employee must be presumed to intend the consequences of his or her voluntary acts.
 {¶ 30} In State ex rel. McKnabb v. Indus. Comm. (2001),92 Ohio St.3d 559, 561, the court held that the rule or policy supporting an employer's voluntary abandonment claim must be written. The court explained:
Now at issue is Louisiana-Pacific's reference to a written
rule or policy. Claimant considers a written policy to be an absolute prerequisite to precluding TTC. The commission disagrees, characterizing Louisiana-Pacific's language as merely illustrative of a TTC-preclusive firing. We favor claimant's position.
The commission believes that there are common-sense infractions that need not be reduced to writing in order to foreclose TTC if violation triggers termination. This argument, however, contemplates only some of the considerations. Written rules do more than just define prohibited conduct. They set forth a standard of enforcement as well. Verbal rules can be selectively enforced. Written policies help prevent arbitrary sanctions and are particularly important when dealing with employment terminations that may block eligibility for certain benefits.
(Emphasis sic.)
 {¶ 31} On March 8, 2001, relator signed a written acknowledgement that she had received a copy of Tomasco's Associate Handbook. Tomasco provided what it felt was the relevant portion of the handbook supporting its decision to terminate relator's employment. The handbook states:
Physician's statements for absences of 3 work days or more must be presented prior to your return to work. Failure to do soshall result in being sent home and not permitted to return towork until the required documentation is provided. For each day of absence for reason to obtain and failure to provide the required documentation shall cause the absence to be considered as unexcused and shall result in the appropriate attendance points to be applied to your record.
Associate Counseling
Corrective action for unexcused absences and tardiness in a 12 month period will be taken as follows:
— Three (3) points will result in a verbal notice.
— Four (4) points will result in a written notice.
— Five points (5) will result in a final written notice.
— Six (6) points will result in separation of employment.
Any unintended absence or tardiness must be reported by you to the Administration Department within 30 minutes following the start of your shift. Failure to do so may cause the absence or tardiness to be considered unannounced.
Unannounced Absences
Unannounced absences will result in additional attendance points being recorded on your attendance record. Points will be recorded in the following manner for notices of absenteeism received after the scheduled start of your scheduled shift:
— Calls received within the first 30 minutes of your scheduled shift, will result in one (1) point.
— Calls received between 6:31 a.m. and 7:30 a.m. for the first shift, or between 4:01 p.m. and 5:00 p.m. for the second shift, will result in two (2) points.
— Calls received between 7:31 a.m. and 8:30 a.m. for the first shift, or between 5:01 p.m. and 6:00 p.m. for the second shift, will result in three (3) points.
— Calls received after 8:30 a.m. for the first shift, or after 6:00 p.m. for the second shift, will result in four (4) points.
Note: Reporting to work following a late call off, pointsshall be reduced by half.
(Emphasis sic.)
 {¶ 32} It is difficult to see how Tomasco's Associate Handbook provided a clear written notice to relator that she was required to call off work beginning January 12, 2004, under the circumstances of this case. Unfortunately, Tomasco's January 27, 2004 termination letter provides little insight into Tomasco's reasoning as to how its handbook supports a termination.
 {¶ 33} To begin, claimant's absence from work beginning January 12, 2004, cannot be viewed as "unannounced" when Tomasco was in receipt of Dr. Hatheway's December 8, 2003 C-84 that certified a period of TTD beginning January 7, 2004 to an estimated return-to-work date of January 26, 2004, and when Tomasco's MCO had approved the surgery scheduled for January 7, 2004.
 {¶ 34} Clearly, on January 12, 2004 and the days following, Tomasco was not expecting relator to return to work. However, by January 22, 2004, upon being informed by the bureau that the surgery did not occur, Tomasco became concerned as to why relator had not returned to work. On that date, Tomasco called relator into work for a status conference.
 {¶ 35} Even if it can be said that Tomasco had not been kept informed as to the change of circumstances that necessitated the delay in performing the surgery, Tomasco's handbook simply fails to address a duty to call off work during an approved leave of absence when the circumstances supporting the approved leave unexpectedly change.
 {¶ 36} Presumably, had relator not been granted leave from work to have the surgery she would have been scheduled for work on January 12, 2004, since that is the date Tomasco chose as the date the alleged duty to call off work arose. It is apparently Tomasco's theory that because the surgery did not take place as planned on January 7, 2004, relator was obligated to either report to work or call off work on her next regularly scheduled work date, i.e., January 12, 2004.
 {¶ 37} Apparently, at the March 9, 2004 hearing before the DHO, relator "gave no explanation for her failure to communicate her work absences" as the DHO's order states. However, relator's lack of a testimonial explanation at the hearing does not automatically translate into an admission to Tomasco's claim of a voluntary abandonment.
 {¶ 38} Even if relator gave no verbal explanation at the hearing as to why she did not call off work on January 12, 2004, the evidence of record indicates that, on Friday, January 9, 2004, she was discharged from the hospital following treatment of a nonallowed psychiatric disorder. On January 14, 2004, she met with Dr. Hatheway to discuss rescheduling her surgery, and on January 16, 2004, she met with her psychiatrist for follow-up care. Thus, during the week beginning January 12, 2004, when Tomasco theorizes that relator failed a duty to call off work, relator was seeing her doctors to reschedule the surgery. Tomasco never claimed that relator unreasonably delayed to reschedule the surgery nor does the record so indicate. Moreover, the record does not indicate that relator tried to take undue advantage of her situation during the week of January 12, 2004. She simply failed to call off work during a period when Tomasco was already on notice that she would not be at work.
 {¶ 39} The SHO's order of May 3, 2004, improperly suggests that relator's hospitalization and psychiatric follow up to the hospitalization cannot be considered to justify relator's failure to call off work on January 12, 2004, because the hospitalization was for a nonallowed psychiatric condition. Elimination of relator's psychiatric problem from evidentiary consideration obviously favors Tomasco's position that relator had no justification for failing to call off work on the Monday following her Friday discharge from The Ohio State University Hospital.
 {¶ 40} It is indeed settled law that a claim for compensation cannot be advanced or defeated by a nonallowed condition. Stateex rel. Waddle v. Indus. Comm. (1993), 67 Ohio St.3d 452. However, neither Waddle nor its progeny can be construed to support the proposition that the effect of a nonallowed condition on a claimant's behavior or circumstance cannot be considered in defense of an employer's claim of a voluntary abandonment of employment. Clearly, relator's hospitalization for a psychiatric disorder was highly relevant to relator's defense to Tomasco's voluntary abandonment claim. That the commission may have believed otherwise, as the SHO's order strongly suggests, constitutes an abuse of discretion.
 {¶ 41} In short, the commission's finding of a voluntary abandonment based upon Tomasco's termination of relator's employment cannot stand.
 {¶ 42} Accordingly, it is the magistrate's decision that this court issue a writ of mandamus ordering respondent Industrial Commission of Ohio to vacate the May 13, 2004 order of its SHO, and to enter a new order that denies Tomasco's claim of a voluntary abandonment, and adjudicates relator's request for TTD compensation based upon the merits of the request for compensation.