DECISION
{¶ 1} Relator, Leaders Moving Storage Company, filed this original action requesting a writ of mandamus ordering respondent, Industrial Commission of Ohio ("commission"), to vacate its order awarding respondent, Sean L. Calloway ("claimant"), temporary total disability ("TTD") compensation and to enter an order denying that compensation on grounds that claimant voluntarily abandoned his employment with relator.
 {¶ 2} This court referred this matter to a magistrate pursuant to Civ.R. 53(C) and Loc.R. 12(M) of the Tenth District Court of Appeals. The magistrate issued a decision, including findings of fact and conclusions of law, recommending that this court deny the requested writ. (Attached as Appendix A.) The magistrate found that the staff hearing officer ("SHO") did not sufficiently determine whether relator used claimant's excessive absences as a pretext for terminating claimant. However, the magistrate concluded further that relator's work rules did not adequately define the prohibited conduct, as is necessary to support voluntary abandonment under State ex rel.Louisiana-Pacific Corp. v. Indus. Comm. (1995),72 Ohio St.3d 401, and, therefore, denied the writ.
 {¶ 3} Relator filed the following objection to the magistrate's decision:
The Magistrate erred in finding that [relator] cannot show that it had a written work rule that clearly defined the prohibited conduct for which it terminated [claimant] and in recommending that [relator's] request for a writ of mandamus be denied on this basis.
 {¶ 4} No party submitted objections to the magistrate's findings of fact, and we adopt those findings as our own. Nevertheless, a brief recounting of the relevant facts is necessary for our analysis.
 {¶ 5} Claimant began working for relator in May 2003. In September 2003, claimant signed an acknowledgement that he had received relator's Employee Manual, which included the following provisions regarding absences and tardiness:
A consistent pattern of questionable absences can be considered excessive, and may be cause for concern. In addition, excessive lateness or leaving early without letting your Operations Manager know will be considered a "lateness pattern" and may carry the same weight as an absence. Other factors, like the degree and reason for the lateness, will be taken into consideration.
Your Operations Manager will make a note of any absence or lateness, and their reasons, in your personnel file. Be aware that excessive absences, lateness or leaving early may lead to disciplinary action, including possible dismissal.
 {¶ 6} The manual also provided that an employee could be terminated for "excessive absences, tardiness," and other violations of relator's policies. "However, your employment is `at-will,' and you and [relator] have the right to terminate your employment for any or no reason."
 {¶ 7} Relator kept a log of claimant's absences and tardiness in 2004. The log shows that claimant had five unexcused absences and five unexcused instances of tardiness between January and April 17, 2004. On April 24, 2004, relator issued a "Written Reprimand and Probation" to claimant. The reprimand stated: "Your attendance is becoming completely unacceptable and un-excusable. This will not be tolerated." The reprimand also stated that claimant would be placed on "probation" for six months and that claimant's "[f]ailure to resolve [his] attendance problems immediately will result in suspension and or termination with [relator]."
 {¶ 8} Claimant suffered a work-related foot injury on June 21, 2004. The validity of the commission's allowance of the claim is not before us.
 {¶ 9} Relator's absence log shows that claimant had six unexcused absences and 11 instances of unexcused tardiness between May 30 and August 23, 2004. On August 24, 2004, relator issued a "Written Reprimand and Warning" to claimant. The reprimand noted that claimant had been given a restricted duty work schedule as a result of his June 21, 2004 injury. The reprimand also stated: "Any further tardiness or absences willnot be tolerated and will be considered grounds for immediatetermination." (Emphasis sic.)
 {¶ 10} Relator's absence log shows that claimant was absent on August 26, 2004, and that the absence was unexcused. The log notes "Dr." as the reason for the absence. The log also shows that claimant was absent on August 27, 2004, and that the absence was unexcused. The log notes "foot hurting — no Dr. excuse" as the reason for the absence.
 {¶ 11} Following a hearing on March 8, 2005, the SHO found that claimant had not voluntarily abandoned his employment with relator. The SHO stated:
* * * The Staff Hearing Officer was persuaded that the employer had just as many chances to discipline/fire this employee before the allowed injury. The Staff Hearing Officer was persuaded by the evidence presented that the injured worker did call in on 8/27/2004 to report off work, and did not violate the "excessive absences" and "tardiness" policy identified by the employer is [sic] a dischargeable offense.
 {¶ 12} As noted, the magistrate found that the SHO's explanation was not sufficient to determine whether relator used claimant's absences as a pretext for terminating him. However, the magistrate also found that relator's work rules were not sufficiently clear as to support voluntary abandonment underLouisiana-Pacific. No one objected to the former conclusion; relator objected to the latter conclusion.
 {¶ 13} It is well-established that a discharge from employment may be "voluntary" in some circumstances. State exrel. Watts v. Schottenstein Stores Corp. (1993),68 Ohio St.3d 118, 121. In Louisiana-Pacific, the Ohio Supreme Court stated that, when a worker has been discharged for violating a rule, the commission may conclude that the discharge constituted a voluntary relinquishment of employment where: (1) the employer's rule or policy defined the prohibited conduct clearly in writing; (2) the rule or policy identified the violation as a dischargeable offense; and (3) the worker knew, or should have known, both the rule and the consequences of violating the rule or policy. Id. at 403.
 {¶ 14} Where a claimant has voluntarily relinquished his or her job, either by resigning or by abandoning it underLouisiana-Pacific, the claimant is deemed to have accepted the consequence of being without wages for a period of time and is not eligible to receive TTD compensation. See, e.g., State exrel. Daniels v. Indus. Comm., 99 Ohio St.3d 282, 2003-Ohio-3626.
 {¶ 15} The Ohio Supreme Court has explained, however, that, where the conduct is causally related to the injury, the termination of employment is not voluntary. State ex rel. PrettyProducts, Inc. v. Indus. Comm. (1996), 77 Ohio St.3d 5, 7. Rather, "the underlying facts and circumstances of each case determine whether a departure by firing may be voluntary or involuntary." Id. This court has, in many cases, reaffirmed the Supreme Court's holding in Pretty Products and has considered (or required the commission to consider) whether a particular termination was voluntary. See, e.g., State ex rel. Darden v.Indus. Comm., Franklin App. No. 05AP-97, 2005-Ohio-6812 (granting limited writ ordering determination of causal connection between termination and injury), and cases cited therein.
 {¶ 16} The Supreme Court has cautioned that "a postinjury firing must be carefully scrutinized." State ex rel. McKnabb v.Indus. Comm. (2001), 92 Ohio St.3d 559, 562. The court also has emphasized the "great potential for abuse in allowing a simple allegation of misconduct to preclude temporary total disability compensation. We therefore find it imperative to carefully examine the totality of the circumstances when such a situation exists." State ex rel. Smith v. Superior's Brand Meats, Inc.
(1996), 76 Ohio St.3d 408, 411.
 {¶ 17} We begin our analysis with the magistrate's conclusion that, while the SHO implied that pretext was present here, the SHO did not make an express finding of pretext. No objections to this conclusion were submitted. Based on our independent review of the record, we agree with the magistrate's conclusion that the commission's order failed to provide reasoning to support the implied determination that claimant's injury, and not his absences, motivated the termination and, therefore, that the order violated the principles contained in State ex rel. Noll v.Indus. Comm. (1991), 57 Ohio St.3d 203.
 {¶ 18} In this respect, we note, too, the commission's failure to address whether claimant's absences on August 26 and 27, 2004, were related to his injury, as claimant suggests in his memorandum contra relator's objection. Relator's absence log notes "Dr." as the reason for claimant's August 26, 2004 absence, and it notes "foot hurting — no Dr. excuse" as the reason for claimant's August 27, 2004 absence. The commission's order does not reflect consideration of whether claimant's absences on those dates were related to his injury and, therefore, his termination, nor does the record indicate whether claimant raised this issue. If claimant did raise it and the commission failed to address it, then, in this additional respect, the commission's explanation and analysis would be lacking.
 {¶ 19} Having concluded that the commission's order failed to provide sufficient reasoning for its decision, we would ordinarily issue a limited writ to more fully adjudicate the voluntary abandonment question. Here, however, the magistrate also concluded that, in any event, relator could not support voluntary abandonment because its written work rules did not clearly define the prohibited conduct, i.e., absences and tardiness. We turn to that question now.
 {¶ 20} In its objection, relator asserts that its employee manual is sufficiently definite to support voluntary abandonment under the facts of this case. But, relator continues, even if the employee manual alone is insufficient, the April 20, 2004 and August 24, 2004 written reprimands clearly defined the prohibited conduct and, therefore, supported a finding of voluntary abandonment.
 {¶ 21} Neither the SHO's decision nor the magistrate's decision reflects consideration of the impact of the April 20 and August 24 reprimands on the clarity of relator's written work rules for purposes of voluntary abandonment underLouisiana-Pacific. The SHO's decision refers only to relator's "`excessive absences' and `tardiness' policy." It does not refer to claimant's written reprimands. The magistrate noted this omission and concluded: "By ignoring the April 20, 2004 written reprimand, the commission's order suggests that relator was penalized for employing a progressive discipline policy." The magistrate's analysis of the clarity of relator's written work rules, however, refers only to those rules contained in relator's employee manual.
 {¶ 22} In prior opinions considering voluntary abandonment arguments based, in part, on written warnings, this court has considered those warnings in determining whether an employer's work rules sufficiently defined the prohibited conduct. See, e.g., State ex rel. Wal-Mart v. Riley, 159 Ohio App.3d 598,2005-Ohio-521 (considering employee handbook, written corporate policies, and written warning); State ex rel. Abbott Foods, Inc.v. Indus. Comm., Franklin App. No. 03AP-1042, 2004-Ohio-4787
(considering employee handbook, written reprimand, and termination letter). Consideration of all applicable evidence, including the April 20 and August 24 reprimands, was also appropriate here. Without such consideration, both the commission's decision and the magistrate's decision were incomplete. Therefore, we do not adopt the magistrate's conclusion that relator's written work rules did not clearly define the prohibited conduct, and we sustain relator's objection for the limited purpose of ordering adjudication of that question, if it is necessary to the commission's resolution of this matter.
 {¶ 23} In summary, we have raised three issues for possible consideration by the commission: (1) whether pretext precludes relator's claim of voluntary abandonment; (2) if properly raised, whether claimant's absences and, therefore, his termination were related to his injury; and (3) whether relator's work rules, including the written reprimands, adequately defined the prohibited conduct so as to support voluntary abandonment. Having concluded that the commission's analysis of these issues was unsupported or incomplete, we sustain, in part, relator's objection. We grant a limited writ of mandamus and order the commission to consider as many of the identified issues as are necessary to resolve claimant's application for TTD compensation.
Objection sustained in part,
 limited writ of mandamus granted.
Klatt, P.J., and Bryant, J., concur.
 APPENDIX A IN THE COURT OF APPEALS OF OHIO TENTH APPELLATE DISTRICT
State ex rel. : Leaders Moving Storage Company, : Relator, : :
v. : No. 05AP-455 :
The Industrial Commission of Ohio : (REGULAR CALENDAR) and Sean L. Calloway, : Respondents. :
 MAGISTRATE'S DECISION Rendered on October 18, 2005 Bricker Eckler LLP, Thomas R. Sant and Becky L. Ramseyer,
for relator.
Jim Petro, Attorney General, and Sandra E. Pinkerton, for respondent Industrial Commission of Ohio.
Larrimer Larrimer, and Thomas L. Reitz, for respondent Sean L. Calloway.
 IN MANDAMUS {¶ 24} In this original action, relator, Leaders Moving 
Storage Company, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order awarding respondent Sean L. Calloway ("claimant") temporary total disability ("TTD") compensation beginning October 8, 2004, and to enter an order denying said compensation on grounds that claimant voluntarily abandoned his employment with relator.
Findings of Fact:
 {¶ 25} 1. On May 31, 2003, claimant was hired by relator for a position of "crewman" or "mover."
 {¶ 26} 2. On September 2, 2003, claimant signed a form indicating that he acknowledged receipt of relator's employee handbook and that he had read the handbook. Claimant also acknowledged that his employment with relator was at will.
 {¶ 27} 3. The employee handbook states in part:
From time to time, it may be necessary for you to be absent from work. Leaders Moving Co. is aware that emergencies, illnesses, or pressing personal business that cannot be scheduled outside your work hours may arise.
If you are unable to report to work, or if you will arrive late, please contact the Operations Manager immediately. * * *
When you call in to inform Leaders Moving Co. of an unexpected absence or late arrival, simply ask for your Operations Manager. If you're arriving to work late, please let your Operations Manager know when you expect to arrive for work. * * *
Absence from work for two (2) consecutive days without notifying your Operations Manager will be considered a voluntary resignation.
* * *
A consistent pattern of questionable absences can be considered excessive, and may be cause for concern. In addition, excessive lateness or leaving early without letting your Operations Manager know will be considered a "lateness pattern" and may carry the same weight as an absence. Other factors, like the degree and reason for the lateness, will be taken into consideration.
Your Operations Manager will make a note of any absence or lateness, and their reasons, in your personnel file. Be aware that excessive absences, lateness or leaving early may lead to disciplinary action, including possible dismissal.
* * *
Termination of Employment
Leaders Moving Co. will consider you to have voluntarily terminated your employment if you do any of the following:
* * *
Fail to report to work or call in for two (2) or more consecutive work days.
You may be terminated for poor performance, misconduct, excessive absences, tardiness, discrimination, harassment, or other violations of Leaders Moving Co. policies. However, your employment is "at will," and you and Leaders Moving Co. have the right to terminate your employment for any or no reason.
 {¶ 28} On April 20, 2004, relator's operations manager, Chris Hess, and relator's assistant operations manager, Jason Farley, discussed their attendance concerns with claimant. Claimant received a written reprimand and was placed on probation. The disciplinary discussion was memorialized by a memorandum from Hess and Farley to claimant dated April 20, 2004:
ATTENDANCE Your repeated unexcused absences has become a very big concern. This problem has been discussed with you by Chris Hess and Jason Farley. At the time of these various discussions you were told what was expected of you, the importance of being here and on time. You agreed to correct the problem. You were instructed that this is un-acceptable, and will not be tolerated.
As stated in the employee handbook, company meetings and personal meetings you have been instructed and well informed as to what is expected from you and your attend-ance.
From January 2004 thru April 2004 you have had 14 different occurrences that you were either absent or tardy (10 of these were unexcused, 7 being absences).
On Friday we spoke in specific reference to your attendance and you stated that you had the problem under control. On Saturday 04/17/04 you were again absent. This was an unexcused absence.
Your attendance is becoming completely unacceptable and un-excusable. This will not be tolerated.
To indicate just how serious the situation is, I have placed you into a formal level of our discipline procedure. You are being put on probation for a period of 6 months starting 04/21/04 to 10/21/04. I expect you to make the necessary changes in your performance immediately. I expect you to follow all of our rules and procedures and perform every aspect of your job in a fully acceptable manner.
Failure to resolve your attendance problems immediately will result in suspension and or termination with Leaders Moving Co.
We expect you to address this situation immediately.
 {¶ 29} 5. The record contains a company chart recording the dates that claimant was tardy or absent and whether the company considers the tardiness or absence to be excused or unexcused. Beginning January 9 through April 17, 2004, the chart records 15 occasions of tardiness or absence.[1] Five absences are unexcused. Five occasions of tardiness are unexcused.
 {¶ 30} 6. Following the April 20, 2004 disciplinary discussion, the company charted unexcused tardiness on May 30 and June 1, 2004.
 {¶ 31} 7. On June 21, 2004, claimant sustained an industrial injury in the course of his employment with relator. On that date, a heavy cabinet was dropped onto claimant's right foot. The industrial claim was initially allowed for "contusion left foot," and was assigned claim number 04-371629.
 {¶ 32} 8. On July 23, 2004, claimant was examined by orthopedic surgeon Jeffrey E. Gittins, D.O. Dr. Gittins' July 23, 2004 report states:
* * * He states that four weeks ago he dropped a cabinet onto his foot that weighed approximately 200 pounds. He did report this. He was taken to Polaris Urgent Care Center where he was seen, evaluated and placed on crutches. He subsequently followed up with one of my partners, Dr. Michael Cannone, who saw and evaluated the patient, and diagnosed him with a crush injury. He obtained an MRI scan and asked the patient to come see me as a Foot and Ankle Orthopedic Specialist. He presents today for evaluation. He states that weight bearing makes this worse and nothing makes it better. Overall, his symptoms have been about the same.
The patient's walking tolerance is approximately one block. He does prefer a tennis shoe. He denies any sports or activities.
PRIOR TREATMENT: The patient was placed in a cast boot, as well as crutches. He denies anti-inflammatories, injections or surgeries. * * *
* * *
X-rays reviewed today show a skeletally mature individual. No signs of fracture or tumor are identified to the patient's foot. MRI is available for review that does show some subchondral bone edema to the proximal metatarsal joints indicative of a crush injury itself with no specific fracture or Lisfranc injury. There is a 3mm osteochondral lesion to the patient's medial talar dome.
ASSESSMENT:
1. Osteochondral lesion to the patient's talar dome.
2. Crush injury to the patient's foot.
PLAN: At this point in time I have recommended conservative therapy for the patient's foot. We'll immobilize him in a cast boot, non-weight bearing. I'll see him back in three weeks for re-evaluation. In regards to the patient's osteochondral lesion I'll treat this in a conservative fashion, as well. I'm not sure if this is causing the patient any pain or discomfort, but this will be ascertained as the patient follows up with me back in the office.
 {¶ 33} 9. On August 13, 2004, claimant was again seen by Dr. Gittens, who wrote:
* * * He's been doing quite well. He's been maintained in his cast boot, as well as his crutches. He states he has ongoing pain and discomfort.
X-rays reviewed of the patient's left foot today are found to be [illegible]. There are no signs of any fracture to the patient's left foot and no arthritis is identified at this point in time. He does have a previous osteochondral lesion to the patient's [illegible], but it's insidious in its nature. It's not giving the patient any problems at this point in time.
Therefore, I'll follow him in a conservative fashion. Sean does have a crush injury to his foot and those can be very difficult to [manage] more from a pain standpoint. I've asked him to continue with his cast boot at this point in time and wean away from his crutches as tolerated. I'll see him back in one month for re-evaluation.
 {¶ 34} 10. On August 24, 2004, Hess gave claimant another written reprimand stating:
Your current pattern of tardiness and unexcused absences has become a matter of great concern. Due to your work injury on 06/21/04 we have established a regular schedule of restricted duty work hours for you that is from 8:00 am to 1:00 pm Monday through Friday. Your medical providers have informed us thatall appointments and prescriptions regarding your care can be planned around this established work schedule. Therefore, you are expected to be here at work on time and as scheduled. Anyfurther tardiness or absences will not be tolerated and will beconsidered grounds for immediate termination.
We will adjust the stated schedule and duties as your condition improves and your physician permits.
(Emphasis sic.)
 {¶ 35} 11. The chart records that claimant was absent on eight occasions between the date of injury and the August 24, 2004 written reprimand. Only two of the eight absences were excused. During this time period, the chart also indicates that claimant was tardy on 11 occasions. Only two of the 11 occasions of tardiness were excused.
 {¶ 36} 12. On August 27, 2004, claimant's employment was terminated by relator. The August 27, 2004 termination is explained by Hess in his affidavit executed some four months later on January 10, 2005:
I hired Sean Calloway into the position of crewman (mover) on 05/31/03. We had hopes that Sean would work his way into the position of Crew Foreman, but he developed poor attendance habits that I addressed with verbal warnings on several occasions. By April 2004, I had no choice but to handle the matter with a written reprimand and period of probation. Sean was on this probation when his current injury occurred on 06/21/04. We provided Sean with a modified schedule (8 am to 1 pm) of restricted duty as prescribed by his physicians. Even though this schedule was one Sean had asked for and agreed to, he would call off or show up late. Sometimes Sean would say he had doctors' appointments or prescriptions to arrange for. We had already coordinated with Sean's medical providers regarding his modified work schedule. They had assured us Sean could arrange for his medical care around this set work schedule. On 08/24/04 I gave Sean a second written reprimand and warning regarding his current work situation. He became very upset and refused to sign the document. Jason Farley the assistant Operations manager and one of the owners, Craig Crotinger, witnessed this exchange. Sean called off work on 08/26 stating he would have a written doctors excuse the next day. He called in on 08/27 at 9:15, one hour and 15 minutes after he was supposed to have been at work, and stated he had seen the doctor yesterday, but had no excuse and did not have one for 08/27 either. I told Sean that pursuant to his reprimand on 08/24 he was terminated and that I no longer had any work for him.
 {¶ 37} 13. On September 10, 2004, claimant was again seen by Dr. Gittens who wrote:
* * * He is status post crush injury to his foot. He has been having ongoing pain and discomfort to his foot. He states his workers compensation physician has instructed him to go to physical therapy. He states he is doing water aerobics, which is causing him to have ongoing pain and discomfort.
OBJECTIVE FINDINGS: The patient's neurovascular status is intact. The compartments are soft. He has no swelling at this time. He does have some ongoing pain and discomfort to his forefoot as well as plantar foot.
IMPRESSION: Left foot chronic pain status post crush injury.
PLAN: At this time he is to continue in his boot. I will put him on Naprosyn at this time. I will see him back in one month for re-evaluation. I have asked him to wean away from his physical therapy since it is painful for him.
 {¶ 38} 14. On October 8, 2004, claimant was examined by Quinco G. Cristales, M.D., who apparently became the attending physician. On a C-84 dated October 13, 2004, Dr. Cristales certified TTD beginning October 8, 2004, to an estimated return-to-work date of January 9, 2005, based on the left foot contusion.
 {¶ 39} 15. Apparently, claimant moved for an additional claim allowance based upon the reports of Dr. Gittens.
 {¶ 40} 16. On October 20, 2004, Dr. Gittens wrote:
* * * He is status post crush injury to his foot. He has had ongoing pain and discomfort, especially with weather changes and that is why he presents today.
OBJECTIVE FINDNGS: Compartments are soft. The patient's neurovascular status is intact. There is minimal swelling at this time but he has persistent pain. No x-rays were performed today in the office.
ASSESSMENT: Left foot, status post crush injury.
PLAN: At this time I have recommended that the patient be aware of the weather changes that may cause the patient some swelling and soreness and aching to his foot. He is to maintain his boot at this time and look to go into more of a stable type of shoe as well that has more of a stiff sole. He is to continue with anti-inflammatory medication for this type of pain. I have also asked the patient to seek pain management at this time for his chronic issues. * * *
 {¶ 41} 17. On November 8, 2004, Maria R. Coccia, M.D., conducted a file review at the request of the Ohio Bureau of Workers' Compensation. Dr. Coccia opined: "[I]t is therefore reasonable that a causal relationship between the requested condition of crush injury of the left foot and [date of injury] is substantiated with the available medical evidence."
 {¶ 42} 18. Following a December 29, 2004 hearing, a district hearing officer ("DHO") issued an order additionally allowing the claim for "crushing injury left foot" based upon Dr. Gittens' reports and Dr. Coccia's file review. The DHO order further states:
* * * [T]he request for temporary total compensation from 10/08/2004 to 01/09/2005 is denied. The District Hearing Officer finds that the claimant voluntarily abandoned his employment on 08/27/2004, and is therefore barred from receiving temporary total compensation. The claimant violated a written work rule which clearly identified "excessive absences" and "tardiness" as prohibited conduct. This conduct was previously identified by the employer as a dischargeable offense in the company's employee manual and this rule was known or should have been known by the claimant as is evidenced by the "Receipt and Acknowledg-ment of Leaders Moving Company Employee Manual" form signed by the claimant on 09/02/2003. Pursuant to the [State ex rel.Louisiana-Pacific Corp. v. Indus. Comm. (1995),72 Ohio St.3d 401] case, the claimant is not entitled to receive temporary total compensation benefits. This order is based upon the aforementioned "Receipt and Acknowledgement" form, the written reprimands dated 04/20/2004 and 08/24/2004, the Employee Manual (page 22), the record of absences and tardiness from 01/09/2004 to 08/27/2004 (38 occurrences), and the Disallowance of Unemployment bene-fits dated 10/08/2004.
 {¶ 43} 19. Claimant administratively appealed the DHO's order of December 29, 2004.
 {¶ 44} 20. On a C-84 dated January 27, 2005, John E. Ratliff, D.O., extended the previous certification of TTD from January 9, 2005, to an estimated return-to-work date of March 1, 2005, based upon the left foot contusion and the crushing injury left foot.
 {¶ 45} 21. Following a March 8, 2005 hearing, a staff hearing officer ("SHO") issued an order that modifies the DHO's order. The SHO additionally allowed the claim for "crush injury left foot" as the DHO had done. However, the SHO awarded TTD compensation:
Temporary Total Disability compensation is awarded from 10/8/2004 to 3/08/2005, and to continue upon submission of medical evidence. This award is based on the C-84 from Dr. Cristales dated 10/13/2004 and the C-84 from Dr. Ratliff dated 1/27/2005. This finding is also supported by the physician's narrative review of Dr. Coccia dated 11/08/2004. Dr. Coccia opines that a period of Temporary Total Disability as re-quested is reasonable and is causally related to the allowed injury.
The Staff Hearing Officer finds no voluntary abandonment of employment by the Injured Worker on 8/27/2004. As such, Temporary Total Disability is payable in this claim, com-mencing 10/08/2004. The Staff Hearing Officer was per-suaded that the employer had just as many chances to discipline/fire this employee before the allowed injury. The Staff Hearing Officer was persuaded by the evidence pre-sented that the injured worker did call in on 8/27/2004 to report off work, and did not violate the "excessive absences" and "tardiness" policy identified by the employer [as] a dis-chargeable offense.
All evidence was reviewed and considered, including the letter from the employer submitted at the hearing today.
 {¶ 46} 22. On April 22, 2005, another SHO refused relator's administrative appeal from the SHO's order of March 8, 2005.
 {¶ 47} 23. On May 9, 2005, relator, Leaders Moving Storage Company, filed this mandamus action.
Conclusions of Law:
 {¶ 48} It is the magistrate's decision that this court deny relator's request for a writ of mandamus, as more fully explained below.
 {¶ 49} A voluntary departure from employment precludes receipt of TTD compensation. An involuntary departure does not. In State ex rel. Louisiana-Pacific Corp. v. Indus. Comm.
(1995), 72 Ohio St.3d 401, the claimant was fired for violating the employer's policy prohibiting three consecutive unexcused absences. The court held that the claimant's discharge was voluntary, stating:
* * * [W]e find it difficult to characterize as "involuntary" a termination generated by the claimant's violation of a written work rule or policy that (1) clearly defined the prohibited conduct, (2) had been previously identified by the employer as a dischargeable offense, and (3) was known or should have been known to the employee. Defining such an employment separation as voluntary comports with Ashcraft [State ex rel. Ashcraft v.Indus. Comm. (1987), 34 Ohio St.3d 42] and Watts [State exrel. Watts v. Schottenstein Stores Corp. (1993),68 Ohio St.3d 118] — i.e., that an employee must be presumed to intend the consequences of his or her voluntary acts.
 {¶ 50} In State ex rel. McKnabb v. Indus. Comm. (2001),92 Ohio St.3d 559, 561, the court held that the rule or policy supporting an employer's voluntary abandonment claim must be written. The court explained:
Now at issue is Louisiana-Pacific's reference to a written
rule or policy. Claimant considers a written policy to be an absolute prerequisite to precluding TTC. The commission disagrees, characterizing Louisiana-Pacific's language as merely illustrative of a TTC-preclusive firing. We favor claimant's position.
The commission believes that there are common-sense infractions that need not be reduced to writing in order to foreclose TTC if violation triggers termination. This argument, however, contemplates only some of the considerations. Written rules do more than just define prohibited conduct. They set forth a standard of enforcement as well. Verbal rules can be selectively enforced. Written policies help prevent arbitrary sanctions and are particularly important when dealing with employment terminations that may block eligibility for certain benefits.
(Emphasis sic.)
 {¶ 51} In State ex rel. Walters v. Indus. Comm., Franklin App. No. 01AP-1043, 2002-Ohio-3236, some 17 months after Michael Walters sustained a crush injury to his foot in an industrial accident, his employer initiated an investigation into his employment application. The investigation revealed that Walters had failed to disclose several criminal convictions and incarcerations on his application. The employer then fired Walters for falsifying his application. The application form had informed Walters that giving false information would justify dismissal if discovered at a later time.
 {¶ 52} The commission found, pursuant to Louisiana-Pacific,
that Walters' termination constituted a voluntary abandonment of employment. However, the commission failed to address Walters' defense that the discharge was a pretext aimed at avoiding employer liability for the industrial injury. Adopting its magistrate's decision, this court, in Walters, issued a writ of mandamus ordering the commission to issue a new order that addresses the pertinent issues.
 {¶ 53} Noting that a discharge motivated by the claimant's filing of a workers' compensation claim is not a voluntary abandonment of employment, the magistrate's decision adopted by this court states:
* * * [W]hen the employer (or other party) raises the argument of voluntary abandonment of employment under Louisiana-Pacific
and supports it with evidence, then the commission must address the elements of proof in Louisiana-Pacific, and must deny TTD if the loss of wages was caused by claimant's voluntary choice. * * * If the claimant argues and presents evidence, however, that his violation of the rule was a pretext for a discharge that was causally related to the industrial injury, then the commission must determine, regardless of proof that the employee knowingly violated a written work rule, whether the employer used the violation as a pretext for discharging him and would have continued to employ him but for the industrial injury and/or workers' compensation claim.
Id. at ¶ 38.
 {¶ 54} Later, in State ex rel. Todd v. Indus. Comm.,
Franklin App. No. 02AP-993, 2003-Ohio-2731, this court was presented with facts remarkably similar to those in Walters. InTodd, the commission found, pursuant to Louisiana-Pacific,
that the claimant had voluntarily abandoned her employment. Unlike Walters, however, Todd did not argue that her discharge was pretextual before the commission. Thus, this court did not find an abuse of discretion in the commission's failure to address whether the discharge was pretextual. See, also, Stateex rel. Gross v. Indus. Comm., Franklin App. No. 04AP-756, 2005-Ohio-3936 (citing Walters for authority to remand to consider whether a discharge was a pretext).
 {¶ 55} Here, the SHO's order strongly suggests that the August 27, 2004 discharge was found to be a pretext: "The Staff Hearing Officer was persuaded that the employer had just as many chances to discipline/fire this employee before the allowed injury."
 {¶ 56} While the analysis in the SHO's order is incomplete, the above-quoted portion of the SHO's order strongly suggests that the SHO had found that the industrial injury motivated relator to discharge claimant and that the reason for the SHO's finding is her observation that the employer had just as many opportunities to fire claimant before the industrial injury.
 {¶ 57} In the magistrate's view, simply making the observation that relator had as many opportunities to fire claimant before the injury as it did after the injury, does not provide sufficient reasoning to support a finding that the discharge was pretextual under the circumstances presented here. Where the reasoning provided in a commission's order fails to support the commission's conclusion, or suggested conclusion, the conclusion cannot stand under mandamus review. See State ex rel.Noll v. Indus. Comm. (1991), 57 Ohio St.3d 203, syllabus.
 {¶ 58} Under the circumstances of this case, claimant received a written reprimand and was placed on probation prior to his industrial injury. The commission fails to address this undisputed key fact in its order. As relator here points out, on April 20, 2004, relator used progressive discipline to address claimant's attendance problem. By ignoring the April 20, 2004 written reprimand, the commission's order suggests that relator was penalized for employing a progressive discipline policy. An industrial injury cannot serve to immunize a previously reprimanded claimant from the consequences of his or her own actions relating to the employer's work rules.
 {¶ 59} In short, the commission's order is flawed for failing to provide reasoning to support the implied determination that the discharge was motivated by the industrial injury and was a pretext.
 {¶ 60} The next sentence of the SHO's order is also seriously flawed: "The Staff Hearing Officer was persuaded by the evidence presented that the injured worker did call in on 8/27/2004 to report off work, and did not violate the `excessive absences' and `tardiness' policy identified by the employer [as] a dischargeable offense."
 {¶ 61} The SHO's statement misses the point. There was no dispute about whether claimant called in on August 27, 2004, to report off work. The Hess affidavit, which the commission order refers to as "the letter from the employer," specifically states: "He called in on 08/27 at 9:15, one hour and 15 minutes after he was supposed to have been at work, and stated he had seen the doctor yesterday, but had no excuse and did not have one for 08/27 either."
 {¶ 62} The chart shows that relator considered claimant's absences on August 26 and 27, 2004, to be unexcused. They were considered unexcused because claimant did not have a doctor's excuse for either absence. Contrary to what the SHO's order suggests, the two consecutive absences were not considered by relator to be unexcused because of a failure to call in to work.
 {¶ 63} The remainder of the above-quoted sentence from the SHO's order simply concludes that relator "did not violate the `excessive absences' and `tardiness' policy identified by the employer [as] a dischargeable offense." However, the order provides no reasoning to support this conclusion in violation ofNoll, supra.
 {¶ 64} While the SHO's order strongly suggests the SHO found the discharge to be pretextual, relator does not claim here that he argued pretext at the administrative proceedings. Whether or not relator actually argued pretext at the administrative proceedings, there is clearly no evidence in the record to support a claim that the discharge was pretextual. Clearly, the SHO's observation that relator had just as many opportunities to fire claimant before the injury as it did after is not, by itself, evidence of pretext under the circumstances here.
 {¶ 65} Interestingly, the commission here does not argue that the discharge was pretextual or that the commission's observation that relator had just as many opportunities to fire claimant before the injury supports a finding of pretext. What the commission argues is that the employee handbook fails to clearly define the prohibited conduct for which claimant was discharged. The commission argues that the employee handbook fails to define the meaning of "excessive absences, tardiness" that can result in a discharge. The magistrate agrees.
 {¶ 66} In State ex rel. Naylor v. Indus. Comm., Franklin App. No. 04AP-715, 2005-Ohio-2712, this court issued a writ of mandamus that ordered the commission to vacate its order that found a voluntary abandonment of employment and to enter an order that denies the employer's claim of a voluntary abandonment and adjudicates the request for TTD compensation on its merits. InNaylor, at ¶ 6, upon examination of the employer's handbook, this court determined that the employer "failed to identify a written policy that clearly defines the prohibited conduct." InNaylor, this court rejected the employer's waiver argument based upon the claimant's failure during the administrative proceedings, or in the briefs to this court, to argue that the language in the handbook was unclear.
 {¶ 67} Here, because the language of relator's employee handbook is the foundation of relator's claim before the commission that a voluntary abandonment occurred, this court can consider whether the language clearly defines the prohibited conduct that resulted in a discharge. Naylor, supra.
 {¶ 68} While the commission failed, in its order, to explain why relator's claim to a voluntary abandonment should be denied, it would be futile to remand this matter to the commission for further proceedings. Regardless of the outcome of further proceedings at the commission, relator cannot show, underLouisiana-Pacific, that its written work rule or policy clearly defined the prohibited conduct.
 {¶ 69} Accordingly, for all the above reasons, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.
[1] Apparently, the April 20, 2004 memorandum's reference to 14 occurrences through April 2004 does not include the April 17, 2004 unexcused absence.