DECISION
{¶ 1} Betty M. Galligan has filed this action in mandamus, seeking a writ which compels the Industrial Commission of Ohio ("commission") to vacate its order denying her temporary total disability ("TTD") compensation and which compels the commission to enter a new order granting the compensation. *Page 2 
 {¶ 2} In accord with Loc. R. 12, the case was referred to a magistrate to conduct appropriate proceedings. The parties stipulated the pertinent evidence and filed briefs. The magistrate then issued a magistrate's decision which contains detailed findings of fact and conclusions of law. (Attached as Appendix A.) The magistrate's decision includes a recommendation that we issue a limited writ of mandamus which compels the commission to determine Betty Galligan's entitlement to TTD without regard to her employer Tenable Security Inc.'s ("Tenable") claim she voluntarily abandoned her employment.
 {¶ 3} Counsel for the commission has filed objections to the magistrate's decision. Counsel for Tenable Security Inc. ("Tenable") has also filed objections. Counsel for Betty Galligan has filed a memorandum in response. The case is now before the court for a full, independent review.
 {¶ 4} Betty Galligan suffered extremely painful injuries in a fall on her jobsite. As a result, she received prescriptions for a variety of powerful painkillers, including percocet.
 {¶ 5} Tenable transferred her job assignment from an active responsibility to a job where she basically watched a rarely used door for hours on end. This aggravated her drowsiness from the medication and probably did little for her outlook on life.
 {¶ 6} Galligan was written up for a variety of company infractions following her injuries. Some were for being late in arriving at work. Some were from falling asleep on the job. Others were for other infractions. The issue before the commission and now before the court is whether these various infractions were so serious as to constitute a voluntary abandonment of employment. *Page 3 
 {¶ 7} The magistrate, in finding that a voluntary abandonment of employment had not occurred, relied heavily upon the failure of Tenable to put its employee handbook in evidence, so the commission and subsequently this court could determine if Galligan was on notice that her infractions would result in her being fired. The commission, in its objections, acknowledges that the failure to present the handbook is problematic but maintains that the event should not bar the employer from having another opportunity to prove voluntary abandonment of employment with the help of the employee handbook.
 {¶ 8} Tenable, in its objection, argues that its failure to put the employee handbook into evidence is not a dispositive issue.
 {¶ 9} The issue is not whether Betty Galligan made mistakes while on the job. The issue is whether Galligan made mistakes so serious on matters where she was clearly on notice that such mistakes were so serious that committing them amounted to knowingly forfeiting her job.
 {¶ 10} The record before us indicates that the employee handbook does not contain provisions which put an employee on notice that her employment was automatically in jeopardy. For instance, when Tenable wrote Galligan up for "excessive absence and tardiness," in part because she missed work for three days after the injuries, Galligan was advised she was being placed on 90 days probation. If she had some attendance problems during that 90 days she was told she faced additional disciplinary actions.
 {¶ 11} Approximately one month later, Galligan was advised that "[a]ny infraction of any Tenable or client policy will result in immediate termination." The record indicates no further such violation by Galligan. *Page 4 
 {¶ 12} The next day, Galligan was written up for violating a Tenable policy which required that employees contact their immediate supervisors at least eight hours before shift start if they are going to miss the shift.
 {¶ 13} The next day, Galligan was written up for supposedly failing to call in advance on September 14, 2006. This write-up seems to be in tension with the previous write-up, which indicates Galligan called in after her shift on September 13, 2006 to say she would not be reporting for duty.
 {¶ 14} Neither write up set forth above indicates that Galligan would be fired if she missed work again without calling in eight hours in advance.
 {¶ 15} A month later, Galligan received a "final warning regarding tardiness." Again, she was advised that future infractions would result in "disciplinary action up to and including termination of employment."
 {¶ 16} Over three weeks later, Galligan was written up for "careless, inadequate and ineffective performance of duty — insubordination." She was advised that "any future violation of any company policy will result in immediate termination of employment."
 {¶ 17} On December 5, 2006, after the end of the 90-day probationary period, Galligan was seen as having fallen asleep at her post, based upon a one and one-half to two minute observation by a supervisor. No disciplinary action was recommended.
 {¶ 18} On January 17, 2007, Galligan was written up for offering some of her pain pills to a supervisor who was complaining of back pain.
 {¶ 19} Galligan was written up on January 19, 2007 for failing to stay in the lunch room during her break and for failing to accurately record her absence from the lunch room. *Page 5 
 {¶ 20} The record contains a memorandum in which Galligan's supervisor felt Galligan was being disrespectful by saying "whatever" right after the supervisor had said "whatever" to her.
 {¶ 21} On February 23, the same supervisor reported Galligan was asleep at her post for approximately 12 minutes. Galligan was "released of her duties permanently" for this infraction. The supervisor indicated the firing was for violation of company policy and accumulation of employee reprimands. The termination was marked "involuntary" by the same supervisor.
 {¶ 22} When Galligan was written up for her supposedly sleeping 1.5 to 2 minutes on December 5, 2006, she was not informed that any future such infraction would result in her termination.
 {¶ 23} Galligan may not have been a model employee, but none of her conduct was of the kind which has been considered a voluntary abandonment of employment absent a written policy which advised her the conduct would result in automatic termination. The various write ups strongly indicate that the written employee handbook had no such provision, because each time she was advised that future discipline would come. The one instance where she was advised a repeat of her conduct would result in automatic termination, she did not repeat the conduct.
 {¶ 24} Under the circumstances, there is no reason for the commission to revisit the claims of voluntary abandonment of employment.
 {¶ 25} The objections of both the commission and Tenable are overruled. The findings of fact and conclusions of law contained in the magistrate's decision are adopted. We grant a writ of mandamus vacating the July 26, 2007 order of the commission through *Page 6 
its staff hearing officer and return the matter for additional review of Galligan's request for TTD.
Objections overruled; writ granted.
KLATT, J., concurs.
 FRENCH, J., concurs in judgment only. *Page 7 
 APPENDIX A MAGISTRATE'S DECISION Rendered September 9, 2008 IN MANDAMUS {¶ 26} In this original action, relator, Betty M. Galligan, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order denying her request for temporary total disability ("TTD") compensation *Page 8 
beginning February 27, 2007, on grounds that she voluntarily abandoned her employment, and to enter an order granting said compensation.
Findings of Fact: {¶ 27} 1. On August 8, 2006, relator sustained an industrial injury while employed as a security officer for respondent Tenable Security Inc. ("Tenable" or "employer"), a state-fund employer. The industrial claim (No. 06-852210) is allowed for:
 Contusion right knee; sprain right knee leg nos; head contusion, cervical sprain/strain, thoracic sprain/strain, lumbar sprain/strain, right shoulder sprain/strain and also for non-displaced fracture right seventh rib.
 {¶ 28} 2. The injuries occurred when relator tripped and fell while walking on a sidewalk in a construction zone. She was initially treated at the Elyria Hospital Emergency Room.
 {¶ 29} 3. On September 19, 2006, relator was initially treated by Timothy Morley, D.O. Dr. Morley reported his examination:
 * * * She does appear in some minor distress secondary to pain through the right side of her body. She has a flat affect.
 * * * She does have some complaints of pain over the right TMJ. The TMJs bilaterally are symmetrical with opening and closing of the jaw. She complains of pain midline cervical to palpation as well as into the traps bilaterally. She has fairly significant guarding through the superior right shoulder joint as well as at the AC joint. There is crepitus at the AC joint. Abduction of her right shoulder is to 90 degrees. I appreciate no subluxation. There is fairly significant guarding with motion above about 45-50 degrees with that shoulder. She shows fairly significant guarding through the right thoracic area radiating anterior to the mid axillary line. She has some rhonchi right lower lung. Respiratory rate is 16. There are moderate amounts of guarding through the lumbar area. She has difficulty with motion at the lumbar spine. That is not only from lumbar pain but also from thoracic pain with quite a bit of guarding through the right rib cage. I did not push that *Page 9 
[range of motion]. There is some lumbar spasm. The right knee shows no instability. There is guarding both medial and lateral joint space. There is some slight crepitus. * * *
 {¶ 30} 4. On September 19, 2006, Dr. Morley noted that he would seek authorization for an MRI of the right shoulder and for another chest x-ray. He refilled relator's prescription for Oxycodone. He notes that she was prescribed Percocet at the emergency room. He also reported that she was continuing to work light-duty for her employer.
 {¶ 31} 5. On October 10, 2006, relator returned to see Dr. Morley, who wrote:
 * * * She sustained injury to not only the right knee but also the right shoulder, cervical, thoracic and lumbar spine. She also sustained reported rib fracture. She smacked the right side of her face against the cement. She continues to have some jaw discomfort. We discussed the medications. She takes Percocet for the severe pain. We discussed her situation. She is continuing to work with restrictions. We submitted a C9 to have her follow-up for a right shoulder MRI as well as a chest x-ray. It was denied because there was no allowance for the right shoulder or chest wall conditions. * * *
 {¶ 32} On October 10, 2006, Dr. Morley set forth the treatment plan. He indicated that he would seek to amend the claim for additional allowances in order to obtain the right shoulder MRI and chest x-ray. He further wrote:
 We discussed the medications and she understands the side effects. She [takes the] Percocet only for severe pain. We will continue with that. Percocet 5/325 q8h PRN #20[.]
 We discussed her work situation. She will continue to work with restrictions. * * *
 {¶ 33} 6. On November 7, 2006, relator returned to see Dr. Morley who wrote:
 * * * [S]he is continuing to work. We discussed the medications and at this point, I am going to add Skelaxin. *Page 10 
She does not take the Percocet and go to work, she takes that usually at night for the pain.
 * * *
 We discussed the medications. I refilled the Percocet. She understands the side effects, dependency, and tolerance. She will take that sparingly. I did add Skelaxin. * * *
 {¶ 34} 7. On November 28, 2006, relator returned to see Dr. Morley who wrote:
 * * * She states that she has pain all over. She states that the pain was such that this past weekend she followed up at the ER. She was given Lyrica. She's taking 50 mgs in the morning and 50 mgs at night which is making her very tired. I'm going to switch her to the 100 mgs at night. She states that it does help somewhat. I also had a discussion with her about the medications. I'm going to discontinue the Percocet and I'm going to put her on Lortab. She's taking 20 over the course of a month. She understands the side effects. I told her not to take that and work. She was off of work for a few days secondary to the pain. She's returned to work now. * * *
 {¶ 35} 8. On December 28, 2006, relator returned to see Dr. Morley who wrote: "She's continuing to work. She states that the medications enable her to function somewhat."
 {¶ 36} 9. On January 29, 2007, relator returned to see Dr. Morley who wrote:
 * * * She's able to work. We discussed the medications. She's been on the Lortab 10 mgs. She states that's not helping as much as it has in the past. At this point, I'm going to discontinue that and put her on the Percocet 7.5 mgs. She'll take that sparingly. I'm also going to increase the Lyrica which she states does help. She can take 200 mgs at night. She, in general, is pleased with the Lyrica. We discussed her pathology. She does feel as though she's getting worse. She states that during the injury she heard a "tear" in her right shoulder and a "pop" in her neck. At this point, she's complaining of severe neck pain radiating through the shoulder. I'm going to submit C9s for both of those areas. * * * *Page 11 
 {¶ 37} 10. On February 27, 2007, relator returned to see Dr. Morley who wrote:
 [Patient] returns here today not doing well. She's still having pain. She states that the pain is at times debilitating. We discussed the medications. The Percocet isn't working as well as it has in the past. She takes is usually about one a night. I'm going to change the Percocet back to the Lortab. She will continue with the Lyrica. We reviewed the cervical MRI and it's normal. The shoulder MRI shows a tear of her rotator cuff. She went to Dr. Stanfield in the past for that. She does not want to follow back up with him. At this point, I talked to the case manager. We're going to submit a C9 for the orthopedic consultation as well as the additional allowance. She's also complaining of quite a bit of increasing right knee pain and left ankle pain. She states that the right knee buckles and gives out. She may need an MRI of that. The left ankle is also giving her problems to the point where she has difficulty walking. At this point, we're going to get her to the orthopedic surgeon and she needs to make sure that she addresses all three of those issues with the orthopedic surgeon. * * *
 {¶ 38} 11. Tenable uses a form captioned "Employee Consultation" to inform or warn an employee regarding behavior that Tenable views as inappropriate. The form provides blank spaces for the employer to give a "Description of Incident" and the "Action to be Taken." The form also provides blank spaces for an "Employee Statement."
 {¶ 39} 12. The record contains a Tenable "Employee Consultation" dated August 16, 2006, just eight days following the industrial injury. Under "Description of Incident," Tenable wrote:
 EXCESSIVE ABSENSE AND TARDINESS
 OFFICER GALLIGAN WAS ADIVSED ON 8-14-06 BY COMMANDER NOVAK OF CONCERN REGARDING ATTENDANCE HISTORY. *Page 12 
 Officer Galligan's attendance history is as follows: 7-17-06 15 minutes late, 7-18-06 10 minutes late, 7-19-06 20 minutes late, 7-24-06 Called off, 7-25-06 Called off, 7-26-06 Called off, 8-3-06 1.5 hours late, 8-9-06 Called off, 8-10-06 Called off and 8-11-06 Called off.
 After the conversation on 8-14-06 Officer Galligan arrived late for duty on 8-16-06 (5 minutes late).
(Emphases sic.)
 {¶ 40} Under "Action to be Taken," Tenable wrote:
 Officer Galligan is expected to report for duty on time and when scheduled. As of this date (8-16-06) Officer Galligan is on 90 days probation. Any attnedance [sic] violations during probationary period will result in disciplinary actions up to and including termination of employment.
 Under "Employee Statement," relator wrote: "I do understand."
 {¶ 41} The record contains a Tenable "Employee Consultation" dated September 12, 2006. Under "Description of Incident," Tenable wrote:
 Violation of Sensitive information and Conflict of interest policy
 Officer Galligan contacted a TPS Officer on post to inquire about another Officer's removal from the work site. According to the complainant, Officer Galligan called the site at approximately 5:30 am on or about Saturday 9-9-06 demanding to know exactly what happened with an Officer that was removed from the site earlier in the week. Officer Galligan also allegedly shared with the complainant where Tenable might be reassigning the Officer and what actions may be taken against that Officer by TPS Management.
 Officer Galligan was present, doing data entry work in the Tenable 24/7 account Managers Office where this information was being discussed amongst Tenable Management.
 {¶ 42} Under "Action to be Taken," Tenable wrote: *Page 13 
 Any infraction of any Tenable or client policy will result in immediate termination of employment from Tenable Protective Services, Inc.
 Under "Employee Statement," relator wrote: "signing unprotest [sic]."
 {¶ 43} 14. The record contains a Tenable "Employee Consultation" dated September 13, 2006. Under "Description of Incident," Tenable wrote:
 EXCESSIVE ABSENCE — NO CALL — NO SHOW-IMPROPER CALL OFF
 Officer Galligan FAILED TO CONTACT HER IMMEDIATE SUPERVISOR (COMM. STACY NOVAK) TO ADVISE THAT SHE WAS NOT REPORTING FOR ASSIGNED DUTY (8a-2p office — light duty) ON 9-13-06. Per Tenable policy, employees are to contact their immediate Supervisor at least 8 hours prior to shift start when calling off for assigned shifts.
 On 9-13-06 Officer Galligan did leave a message on HR voicemail at 2:15 pm stating she had a headache and wouldn't be reporting for duty on 9-13-06. This message was left 15 minutes after assigned shift would have ended.
(Emphases sic.)
 {¶ 44} Under "Action to be Taken," Tenable left the space blank. The "Employee Statement" is also left blank. The form appears to have been signed by relator.
 {¶ 45} 15. The record contains a Tenable "Employee Consultation" dated September 14, 2006. Under "Description of Incident," Tenable wrote:
 EXCESSIVE ABSENCE — NO CALL — NO SHOW-IMPROPER CALL OFF
 Officer Galligan FAILED TO CONTACT TENABLE HER IMMEDIATE SUPERVISOR (COMM. S. NOVAK) TO ADVISE THAT SHE WAS NOT REPORTING FOR ASSIGNED DUTY ON 9-14-06. Per Tenable policy, employees are to contact their immediate Supervisor at least *Page 14 
8 hours prior to the start of their assigned shift to advise of call off.
(Emphases sic.)
 {¶ 46} The spaces under "Action to be Taken" and "Employee Statement" are left blank.
 {¶ 47} 16. The record contains a Tenable "Employee Consultation" dated September 15, 2006. Under "Description of Incident," Tenable wrote:
 EXCESSIVE ABSENSE — TARDINESS
 Officer Galligan REPORTED FOR ASSIGNED DUTY AT APPROXIMATELY 0810 for a 0800 assigned shift.
(Emphases sic.)
 {¶ 48} Under "Action to be Taken," Tenable left the space blank. The "Employee Statement" is also left blank. The form appears to have been signed by relator.
 {¶ 49} 17. The record contains a Tenable "Employee Consultation" dated September 29, 2006. Under "Description of Incident," Tenable wrote:
 INAPPROPRIATE COMMENTS:
 On 9-29-06 I (Commander Novak) received a complaint from office employee (JM) that Officer Galligan made an inappropriate comment to her regarding her being blessed and having great boobs. On a separate occasion Officer Galligan made comments regarding JM's legs and that she (Officer Galligan) and her husband had a date and that they were going to try out their new bed.
(Emphasis sic.)
 {¶ 50} Under "Action to be Taken," Tenable wrote:
 Any further infractions of this nature will result in immediate termination of employment. Officer Galligan is being sent *Page 15 
home for the day and may return to work on Monday October 2nd at 8:00am for assigned duties.
 {¶ 51} Under "Employee Statement," relator wrote:
 Signing under protest I ment [sic] for no one to be offended or hurt by my remarks! I will be careful about being so friendly and be more professional.
 {¶ 52} 18. The record contains a Tenable "Employee Consultation" dated October 17, 2006. Under "Description of Incident," Tenable wrote:
 EXCESSIVE TARDINESS — Officer Galligan arrived late for assigned duty on Monday October 16th, 2006 8:04 AM and on October 17th, 2006 (8:25am). Officer Galligan's assigned shift is Monday through Friday 8a-5p. Officer Galligan's husband did contact Tenable Dispatch at approximately 7:40 am to advise that Officer Galligan may be 5-10 minutes late on October 17th, 2006.
(Emphasis sic.)
 {¶ 53} Under "Action to be Taken," Tenable wrote:
 Final warning regarding tardiness — Officer Galligan must report for assigned duty on time. A future infraction will result in disciplinary action up to and including termination of employment from Tenable Protective Services.
 {¶ 54} Under "Employee Statement," relator wrote: "10-17-06 Very heavy rains-won't happen again."
 {¶ 55} 19. The record contains a Tenable "Employee Consultation" dated November 9, 2006. Under "Description of Incident," Tenable wrote:
 CARELESS, INADEQUATE AND INEFFICIENT PERFORMANCE OF DUTY — INSUBORDINATION
 Officer Galligan did not follow directive as stated by Supervisor (Commander Novak). On November 9th, 2006 Officer Galligan was instructed by Commander Novak to remove, highlite [sic] and replace a specific application to an *Page 16 
envelope containing various insurance booklets and information. Officer Galligan was also advised if the specific application was not present in the envelope to put it aside and go on to the next. Officer Galligan instead, removed all applications from all envelopes, including applications not relative to the project. When Officer Galligan was asked why she did not follow the directive, she stated there was no difference in the packets and it didn't matter. When I (Commander Novak) attempted to advise Officer Galligan that she was issued a specific directive and did not adhere to it, she became belligerent and argumentative and at one point rose from her chair yelling I am not taking another write up from you. I didn't do anything wrong, just tell me where you want me to highlite [sic] these applications. I again attempted to inform Officer Galligan of the need to follow direction as indicated and she again became hostile and at one point stood * * * with me as I stand and asked her to come with me to her work area. Officer Galligan did follow me to her work area where I asked her if she knew what applications came from which packet. She again advised me that it didn't matter where they came from as they were all the same. I attempted to show Officer Galligan that there were 2 different applications and that the packets were not the same and that is why she was instructed to perform the task a specific way. Officer Galligan again became argumentative and confrontational. I (Commander Novak) then removed the packets from the work area and advised Officer Galligan to remain at her station. Officer Galligan said she was not going to sit there and do nothing and that she would just leave. I advised Officer Galligan if she chose to abandon her assignment it would be considered a voluntary resignation of employment. I then asked Officer Galligan to accompany me to the Human Resource Office. Officer Galligan complied and was interviewed by the HR Director regarding the incident and did return to work station afterward.
 {¶ 56} Under "Action to be Taken," Tenable wrote: "Any future violations of any company policy will result in immediate termination of employment."
 {¶ 57} Under "Employee Statement," relator wrote: "The above statement is not true I simply ask [sic] a question." *Page 17 
 {¶ 58} 20. The record contains a Tenable "Employee Consultation" dated December 5, 2006. Under "Description of Incident," Tenable wrote:
 SLEEPING ON POST — SECOND OFFENSE
 At approximately 1:15pm on Tuesday December 5th, 2006 I (Commander Novak) observed Officer Galligan asleep at her post. I (Commander Novak) went to the vending machine located in the rear of the building near the back door where Officer Galligan is posted. As I rounded the corner Officer Galligan was sitting at her assigned desk with her head in her hand asleep. I (Commander Novak) stood there for approximately 1.5 to 2 minutes and watched Officer Galligan. During this time she did not move or open her eyes until I dropped a quarter in the machine. As the quarter dropped, Officer Galligan opened her eyes, closed them, opened them, closed them and then looked over at me. As she looked at me I said Betty and she responded saying I was thinking. I said Betty you were not thinking you were sleeping. She responded, "only for a second". I said, "Betty it was more than a second". She said, "okay 2 seconds". I said, "Betty I stood here for at least 2 minutes and watched you". She said, "okay I'll get up and walk around". I (Commander Novak) retrieved my merchandise from the machine and headed for the HR area to advise Ms. Macias of my observation, as I passed Betty she said, "I'm missing 10,000.00 dollars, he said it went to the house but I don't believe him, should I gather up my stuff". I (Commander Novak) looked at Betty puzzled and said, "no" and entered the HR area.
(Emphasis sic.)
 {¶ 59} Under "Action to be Taken" and "Employee Statement," the spaces are left blank.
 {¶ 60} 21. Regarding the December 5, 2006 incident, the record also contains a memorandum from Commander Stacy Novak stating:
 At approximately 1:50 pm Officer Galligan was observed by me sleeping at her post. I (Commander Novak) advised Officer Galligan that moving forward if she felt as if she were *Page 18 
getting drowsy to get up and move around. I also explained to Betty that her assignment is common in this field and that the only difference between here and being posted off site is that if there is an emergency here there are numerous people to respond and based upon her limitations we could not assign her to an outside post and expect her to respond to emergencies on her own. Officer Galligan stated she understood and would make every effort to remain alert and awake. Officer Galligan was also advised that if she were observed asleep again disciplinary actions would follow.
 {¶ 61} 22. The record contains information on a Tenable form captioned "Voluntary Statement" and dated January 17, 2007:
 On or about January 17th I (Stacy Novak) walked into the lunch room where I encountered Officer Betty Galligan. As I entered Officer Galligan was sitting at the table eating a cinnamon bun from the vending machine. As I walked towards her Officer Gilligan asked if I was okay and I said yeah, I'm just sore my back is killing me. Officer Galligan asked me if I wanted some percocet pain pills and I looked at her puzzled and said "No Betty I'm fine". Betty said "are you sure?" I again told her I was fine and did not want anything from her. Betty said, "okay" and we had no further discussion in the lunch room. As I walked out of the lunch room and began heading towards the Human Resource/Payroll office Betty approached me again with her hand closed and extended and said, "here take these it will just be between me and you". I told Betty in a loud firm voice that I did not want anything and to stop offering me pills. Betty said, "okay I was just trying to help" and walked away. I in turn entered the Human Resource Area and immediately informed Human Resources of my interaction with Betty.
 {¶ 62} The record does not contain a Tenable "Employee Consultation" corresponding to the January 17, 2007 incident reported on the voluntary statement.
 {¶ 63} 23. The record contains a Tenable "Employee Consultation" dated January 19, 2007. Under "Description of Incident," Tenable wrote:
 Inaccurate entries on Daily Activity Report — Verbal Warning *Page 19 
Officer Galligan failed to make entries on daily activity report to include comfort break and actual activity during lunch break. Officer Galligan was observed in women's restroom at 11:50am on 1-18-07 and in the Dispatch area at approximately 12:40pm where she was advised by me that she was not supposed to be in that area and to remain in the lunch room during breaks. When asked what she was doing in the dispatch area, she replied, "talking". Officer Galligan also failed to accurately record her activities for 1-18-07 regarding the (2) two incidents above. * * *
 {¶ 64} Under "Action to be Taken," Tenable wrote:
 Officer Galligan was advised to record activities exactly as they occur and that she is not to "roam" the building or distract other departments while on breaks. Officer Galligan was advised to remain in break area during breaks.
 {¶ 65} The space under "Employee Statement" is left blank. Relator signed the employee consultation on January 19, 2007.
 {¶ 66} 24. The record contains a Tenable memorandum from Commander Novak dated January 24, 2007, stating:
 This is FYI concerning a conversation I had with Officer Gallagan [sic] this morning which in my opinion borders on insubordination. I was speaking with Pete Miragliotta Jr. in the hall near the training room. After the conversation concluded, I walked in the direction of the lunch room. As I entered the lunchroom, Officer Gallagan [sic] asked me if everything was ok. [W]as a little confused with her question not knowing what could be wrong with me walking into the lunchroom. I asked Officer Gallagan [sic] what she meant. She stated she heard someone talking in the hall and just wanted to know if everything was ok. I walked in the lunchroom and shook my head and stated "whatever". Officer Gallagan [sic] in a sarcastic tone stated whatever. I walked out of the lunchroom and inquired what she meant. Officer Gallagan [sic] again in a sarcastic tone stated, Well you said that to me. I advised Officer Gallagan [sic] to be aware of her tone and direction she was taking this conversation as it was apparent she was being extremely sarcastic in her tone. Again she stated, well you said that to *Page 20 
me. I walked away as it was apparent that she was in my opinion attempting to start a verbal altercation.
 {¶ 67} 25. There is no corresponding Tenable "Employee Consultation" report relating to the January 24, 2007 incident reported by Commander Novak.
 {¶ 68} 26. The record contains a Tenable "Employee Consultation" dated February 23, 2007. Under "Description of Incident," Tenable wrote:
 SLEEPING ON POST — THIRD OFFENSE
 At approximately 11:20am on 2-23-07 I (Commander Novak) observed Officer Galligan for a period of approximately 12 minutes asleep at her assigned post. Photographs taken via cell phone are attached as verification of observation.
(Emphasis sic.)
 {¶ 69} Under "Action to be Taken" and "Employee Statement," the spaces are left blank. Commander Novak wrote "Refuse To Sign."
 {¶ 70} 27. The record contains a "Voluntary Statement" from Commander Novak dated February 23, 2007, stating:
 On Friday 2-23-07 at approximately 11:23am I personally observed Officer Betty Galligan asleep and snoring at her post. Officer Galligan was seated in a chair with her head down, chin resting on her chest and hands in lap. I continued to observe Officer Galligan in addition to taking a series of 4 pictures using my camera phone. At approximately 11:30am Officer Galligan opened and closed her eyes a couple of times, opened and closed her right hand 3-4 times as if it were asleep and lifted her head. As her head lifted she saw me standing approximately 5 feet in front of her and said, "I don't feel good, I can hardly move my hand.["] I replied, "You've been asleep for quite awhile Betty". Officer Galligan responded, ["]no I haven't I just dozed off". I (Commander Novak) advised Officer Galligan that I had been standing there for at least 15 minutes and that she had been warned previously about sleeping on duty. Officer Galligan just looked at me and did not verbally respond. I (Commander *Page 21 
Novak) left the area and walked into the Human Resource Office to advise of what I had just observed and documented via the camera phone.
 {¶ 71} 28. The record contains a Tenable "Employee Consultation" dated February 23, 2007. Under "Description of Incident," Tenable wrote:
 FALISFYING DOCUMENTS
 Officer Galligan was relieved of her duties permanently on 2-23-07 for sleeping on post. After her departure from Tenable premises I (Commander Novak) retrieved the sign in sheet for week ending 2-25-07 from the assigned post book to input her departure time of 1:00pm. I was unable to input the time of departure as Officer Galligan had prematurely completed the sign in sheet for the entire week prior to actually working the times listed. [A] copy of the sign-in sheet is attached and shall serve as documentation.
(Emphasis sic.)
 {¶ 72} 29. The record contains a Tenable document captioned "Inter Office Termination Report." It is dated February 23, 2007 and signed by Commander Novak. The form provides boxes to be checked under "Reason for Termination." The following are preprinted beside a box:
 Voluntary Involuntary
 Absenteeism
 Tardiness
 Improper Conduct
 Violation of Company Policy
 Accumulation of Employee Reprimands
 Other
 {¶ 73} Commander Novak placed a checkmark in three of the eight boxes. She checkmarked: (1) violation of company policy; (2) accumulation of employee reprimands; and (3) involuntary. *Page 22 
 {¶ 74} 30. On March 20, 2007, Dr. Morley completed a C-84 on which he certified TTD from February 27, 2007 to an estimated return-to-work date of May 27, 2007. He indicated on the C-84 that relator was restricted to "sedentary duty only."
 {¶ 75} 31. Following a June 4, 2007 hearing, a district hearing officer ("DHO") issued an order additionally allowing the claim for "rotator cuff tear right shoulder with impingement." The additional allowance was based on an MRI done on February 8, 2007 and the treatment records of Dr. Morley.
 {¶ 76} The DHO denied TTD compensation, explaining:
 The Injured Worker's request for the payment of temporary total disability compensation commencing 02/27/07 is denied. The District Hearing Officer finds that the Injured Worker was terminated from her employment, effective 02/23/07, based on numerous violations of written work policies pursuant to [State ex rel. Louisiana-Pacific Corp. v. Indus. Comm. (1995), 72 Ohio St.3d 401], the District Hearing Officer finds that the Injured Worker has voluntarily removed herself from the workforce and is therefore not entitled to the payment of temporary total disability compensation.
 {¶ 77} 32. Relator administratively appealed the DHO's order of June 4, 2007.
 {¶ 78} 33. On July 23, 2007, Dr. Morley wrote:
 As you know, the patient was initially injured on 08-08-2006 at which time she tripped and fell to the ground. She was ultimately diagnosed with multiple sprains/strains and contusions. She fractured her right rib and most recently has been allowed through the BWC for a tear of her right rotator cuff. Both the rib pain as well as the rotator cuff tear can and indeed are painful conditions. Secondary to the above, she has been provided medications through this office including Lyrica 100 mgs which she takes two pills at night as well as Percocet one pill every six hours on an as needed basis. Please note that it is a known side effect of both of these medications that drowsiness may occur. The medications were indeed prescribed secondary to her allowed conditions *Page 23 
from the injury of 08-08-2006. I can state to a reasonable degree of medical certainty.
 {¶ 79} 34. On July 26, 2007, relator executed an affidavit stating:
 [Two] On August 8, 2006 I was injured while performing the duties of my job for Tenable Security.
 [Three] My injuries prevented me from performing the regular duties of my job.
 [Four] My employer offered me a restricted duty job which I attempted to perform to the best of my abilities.
 [Five] I was medically advised to take prescription medications to help me recover from my injuries.
 [Six] Attached is a copy of the medications I was prescribed including the dates when I filled the prescriptions. [Seven] I was taking the medications as prescribed while performing the restricted duty work.
 [Eight] The medications made me drowsy.
 [Nine] Despite my best efforts to remain attentive and alert, I apparently dozed off to sleep in a sitting position while at my restricted duty job.
 [Ten] My regular job was at the "Idea Center" and involved many duties including handing out badges and keys, interaction with people, patrolling the facility, opening doors and many activities. My regular job also permitted me to listen to the radio, read magazines, and work at a desk. All of these activities made it easy to stay attentive and alert during my duties.
 [Eleven] My restricted duty job involved sitting in a chair at a bookcase and watching two rarely used doors for several hours at a time. My injuries made it difficult for me to move around. There was no desk. There was no radio. There were no magazines or other reading materials.
 [Twelve] On both occasions, I did my best to try to remain attentive and alert at my restricted duty job but between the effects of the prescription medication and the lack of any *Page 24 
effective way to combat drowsiness, I inadvertently dozed off to sleep.
 {¶ 80} 35. On July 26, 2007, relator's administrative appeal was heard by a staff hearing officer ("SHO"). Following the hearing, the SHO issued an order stating that the DHO's order is "modified." The SHO affirmed the additional claim allowance. With respect to the denial of TTD compensation, the SHO explained:
 The request for temporary total disability compensation from 02/27/2007 to date is denied. Staff Hearing Officer finds that, the claimant was terminated from her employment due to a variety of violations of specific written work rules of which the claimant had been apprised when she was hired. Claimant's termination is construed as a voluntary abandonment of her employment thereby precluding her from availing herself of temporary total disability compensation benefits. * * *
 {¶ 81} 36. On August 21, 2007, another SHO mailed an order refusing relator's administrative appeal from the SHO's order of July 26, 2007.
 {¶ 82} 37. On January 14, 2008, relator, Betty M. Galligan, filed this mandamus action.
Conclusions of Law:
 {¶ 83} The dispositive issue is whether Tenable's failure to submit its employee handbook is fatal to its voluntary abandonment claim.
 {¶ 84} Finding that Tenable's failure to submit its employee handbook is fatal to its voluntary abandonment claim, it is the magistrate's decision that this court issue a writ of mandamus, as more fully explained below.
 {¶ 85} Preliminarily, the magistrate notes that Tenable steadfastly claims that relator was terminated on February 23, 2007 due to her accumulation of reprimands and not simply because she was caught sleeping at her post on that date. Tenable *Page 25 
asserts that termination was the result of relator's numerous violations of company policy occurring over a span of some seven months. (Respondent Tenable's brief, at 12.)
 {¶ 86} The commission's hearing officers agreed with Tenable's position that the decision to terminate was not based on a single incident or violation.
 {¶ 87} The magistrate notes that Tenable's February 23, 2007 interoffice termination report supports Tenable's position and the commission's agreement with that position. As previously indicated, Tenable's checkmarks indicate that it was the accumulation of employee reprimands that resulted in termination.
 {¶ 88} A voluntary departure from employment precludes receipt of TTD compensation. An involuntary departure does not. State ex rel. RockwellInternatl. v. Indus. Comm. (1988), 40 Ohio St.3d 44.
 {¶ 89} In State ex rel. Louisiana-Pacific Corp. v. Indus. Comm.
(1995), 72 Ohio St.3d 401, 403, the claimant was fired for violating the employer's policy prohibiting three consecutive unexcused absences. The court held that the claimant's discharge was voluntary, stating:
 * * * [W]e find it difficult to characterize as "involuntary" a termination generated by the claimant's violation of a written work rule or policy that (1) clearly defined the prohibited conduct, (2) had been previously identified by the employer as a dischargeable offense, and (3) was known or should have been known to the employee. Defining such an employment separation as voluntary comports with [State ex rel. Ashcraft v. Indus. Comm. (1987), 34 Ohio St.3d 42] and [State ex rel. Watts v. Schottenstein Stores Corp. (1993), 68 Ohio St.3d 118] — i.e., that an employee must be presumed to intend the consequences of his or her voluntary acts. *Page 26 
 {¶ 90} In State ex rel. McKnabb v. Indus. Comm. (2001),92 Ohio St.3d 559, 561, the court held that the rule or policy supporting an employer's voluntary abandonment claim must be written. TheMcKnabb court explained:
 Now at issue is Louisiana-Pacific's reference to a written rule or policy. Claimant considers a written policy to be an absolute prerequisite to precluding TTC. The commission disagrees, characterizing Louisiana-Pacific's language as merely illustrative of a TTC-preclusive firing. We favor claimant's position.
 The commission believes that there are common-sense infractions that need not be reduced to writing in order to foreclose TTC if violation triggers termination. This argument, however, contemplates only some of the considerations. Written rules do more than just define prohibited conduct. They set forth a standard of enforcement as well. Verbal rules can be selectively enforced. Written policies help prevent arbitrary sanctions and are particularly important when dealing with employment terminations that may block eligibility for certain benefits.
(Emphasis sic.)
 {¶ 91} In several voluntary abandonment cases, this court has considered an employer's written warnings or reprimands in determining whether the employer's work rules sufficiently define the prohibited conduct. [State ex rel.] Leaders Moving Storage Co. v. Indus.Comm., Franklin App. No. 05AP-455, 2006-Ohio-1211 (applying the principle and citing other cases at paragraph 22).
 {¶ 92} Here, Tenable submitted relator's February 13, 2006 acknowledgment that she had received the Tenable employee handbook. In her written acknowledgement, relator agreed that she had read the handbook and that she understood its provisions.
 {¶ 93} However, for reasons unexplained in the record, Tenable failed to submit its employee handbook during the administrative proceedings before the commission. *Page 27 
 {¶ 94} Tenable argues that its failure to submit the employee handbook is not fatal to its affirmative defense of voluntary abandonment.
 {¶ 95} According to Tenable, relator's acknowledgement proves not only the existence of the employee handbook, but, also, that the rules contained therein are clearly defined because relator agreed that she fully understood them.
 {¶ 96} Relator's argument misses the point of the requirement that the written work rule clearly define the prohibited conduct. It is the commission initially that must determine whether a specific written work rule clearly defined the conduct for which the claimant was fired. Thereafter, it becomes the duty of the courts in mandamus to review the commission's determination of whether the written work rule clearly defined the conduct for which the claimant was fired.
 {¶ 97} Obviously, if the language of the written work rule is unknown to the commission and to this court, it is impossible for the commission or this court to determine whether the rule clearly defines the prohibited conduct that resulted in the termination.
 {¶ 98} Here, Tenable argues that the multitude of "Employee consultations" of record "name" the policy that was violated. (Respondent Tenable's brief, at 16.) According to Tenable, the policy is "listed on its own line at the top of the `Description of Incident' section of the form." Id. As an example, Tenable points out that the September 26, 2006 "Employee Consultation" indicates that the policy violation was the making of "inappropriate comments." Id. (Emphasis omitted.) *Page 28 
 {¶ 99} Based upon the foregoing, Tenable concludes that the "Employee Consultations" provide "some evidence" that such policies were contained in the employee handbook.
 {¶ 100} Again, Tenable's argument misses the mark. The concern here is not whether the employee handbook contains written rules that relate to the incidents reported in the "Employee Consultations." The concern is that the "Employee Consultations" do not produce the very language of the written rules that allegedly underlie the warnings. Moreover, in the absence of the employee handbook, the context of the specific written rule at issue cannot be known even if the language of the written rule itself be known.
 {¶ 101} In short, Tenable's failure to submit the employee handbook prevents judicial review of the discharge on the question of whether the written work rules clearly define the prohibited conduct. On that basis, this magistrate must conclude that Tenable's failure to submit the employee handbook was fatal to its voluntary abandonment claim.
 {¶ 102} Accordingly, for all the above reasons, it is the magistrate's decision that this court issue a writ of mandamus ordering the commission to vacate the July 26, 2007 order of its SHO, and to enter a new order that adjudicates relator's request for TTD compensation without regard to Tenable's voluntary abandonment claim. *Page 1